# UNITED STATES COURT OF APPEALS
# for the
# NINTH CIRCUIT

———————

BILLFLOAT INC.,

Plaintiff, Appellee, Appellant

v.

COLLINS CASH INC. AND ABRAHAM COHEN,

Defendants, Appellants, Appellee

———————

Appeal from The United States District Court, Northern
District of California, Case No. 3:20-cv-09325,
Hon. Edward M. Chen

———————

**First Brief on Cross-Appeal by BillFloat Inc.**

———————

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
Todd E. Lundell, SBN 250813
tlundell@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, CA 92626
Tel: 714.513.5100

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
Martin R. Bader, SBN 222865
mbader@sheppardmullin.com
Jesse A. Salen, SBN 292043
jsalen@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, CA 92130
Tel: 858.720.8900

Attorneys for BillFloat Inc.

## Corporate Disclosure Statement

BillFloat Inc. has no parent corporation and no publicly held companies own 10% or more of its stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement .......................................................... i

Table of Authorities ........................................................................ iv

Introduction .................................................................................... 1

Statement of Jurisdiction .................................................................. 6

Statement of Issues .......................................................................... 6

Statement of the Case ...................................................................... 7

    A.    BillFloat Builds its Valuable "SmartBiz" Brand. ..................... 7

    B.    Collins Cash Begins Using its Similar Smart Business Funding Brand for the Same Types of Services. ...................... 8

    C.    BillFloat Brings this Action to Stop Consumers from Being Confused. ............................................................... 10

    D.    To Counter BillFloat's Confusion Evidence, Defendants' Expert Designs a Survey that is Highly Flawed and *Predetermined* to Show No Confusion. ................ 11

    E.    The District Court Denies BillFloat's Motion to Exclude Mr. Keegan's Deceptive Market Survey. .................................. 11

    F.    The District Court Denies BillFloat's Request to Preclude Defendants from Attributing a Negative Inference to BillFloat's Decision Not to Conduct a Market Survey. ...................................................................... 13

    G.    Defendants Present Mr. Keegan's Deceptive Market Survey to the Jury and Violate Multiple District Court Orders. ..................................................................................... 13

    H.    The District Court Denies BillFloat's Motions for a Judgment as a Matter of Law and a New Trial. ...................... 14

Summary of Argument ................................................................... 15

Legal Discussion ........................................................................... 23

    A.    Standard of Review ......................................................... 23

    B.    Mr. Keegan's Deceptive Market Survey and Testimony Should have Been Excluded. ........................................... 24

        1.      Mr. Keegan used an improper survey universe. ...........30

        2.      Mr. Keegan used a fatally flawed survey design that did not include a control group. ................................40

        3.      Mr. Keegan's survey lacked a proper control stimuli. ....................................................................41

    C.    The District Court Should Have Instructed the Jury that No Consumer Survey Was Required to Show Likely Confusion. ...........................................................48

    D.    The District Court's Evidentiary And Instructional Decisions Prejudiced BillFloat. ...................................51

        1.      The Survey Evidence And Lack of Instruction Regarding Any Negative Inference Left the Jury to Speculate About Factors Irrelevant to *Sleekcraft*. ..............................................................51

        2.      The Clear Weight of the Evidence Demonstrating Infringement Shows It Was Reasonably Probable That the Jury Would have Reached a Different Result in the Absence of Error. ........................................55

Conclusion .............................................................................64

Certificate of Compliance......................................................65

Statement of Related Cases ..................................................66

Certificate of Service.............................................................67

# Table of Authorities

Page(s)

<u>Cases</u>

*Aguilar v. City of Los Angeles*
    853 Fed. Appx. 92 (9th Cir. 2021) ....................................................... 23

*AMF, Inc. v. Sleekcraft Boats*
    599 F.2d 341 (9th Cir. 1979)........................................................ passim

*Amstar Corp. v. Domino's Pizza, Inc.*
    615 F.2d 252 (5th Cir. 1980)............................................................. 38

*CheesebroughPond's, Inc., v. Faberge, Inc.*
    666 F.2d 393 (9th Cir. 1982)............................................................. 26

*Citizens Fin., Group, Inc. v. Citizens Nat'l Bank of Evans City*
    383 F.3d 110 (3d Cir.2004) ............................................................... 32

*Clicks Billiards, Inc. v. Sixshooters, Inc.*
    251 F.3d 1252 (9th Cir. 2001)......................................... 15, 16, 22, 24

*Daubert v. Merrell Dow Pharms*
    509 U.S. 579 (1993)................................................................... passim

*E & J Gallo Winery v. Proximo Spirits, Inc.*
    Case No. 1:10-cv-00411 LJO JLT, 2011 WL 5922090 (E.D. Cal.
    Nov. 28, 2011) ................................................................................... 25

*Edmondson v. RCI Hosp. Holdings, Inc.*
    No. 16-CV-2242 (VEC), 2020 WL 1503452 (S.D.N.Y. Mar. 20,
    2020)................................................................................................... 42

*Icon Enters. Int'l, Inc. v. Am. Prods. Co.*
    No. CV 04-1240 SVW, 2004 WL 5644805 (C.D. Cal. Oct. 7,
    2004)
    ..................................................................................................... 31, 32

*Jones v. Williams*
    297 F.3d 930 (9th Cir. 2002)............................................................. 23

*Kournikova v. General Media Communications, Inc.*
  278 F. Supp 2d 1111 (C.D. Cal. 2003) ........................................ passim

*Kudos Inc. v. Kudoboard LLC*
  Case No. 20-cv-01876-SI, 2021 WL 5415258 (N.D. Cal. Nov. 20,
  2021)
  ...................................................................................... passim

*Kumho Tire Co., Ltd., v. Carmichael*
  526 U.S. 137 (1999) ..................................................................... 20, 26

*Lam v. City of San Jose*
  869 F.3d 1077 (9th Cir. 2017) ......................................................... 23, 24

*M2 Software, Inc. v. Madacy Entm't*
  421 F.3d 1073 (9th Cir. 2005) ...................................................... passim

*Martinez v. Ylst*
  951 F.2d 1153 ............................................................................. 52

*Masson v. New Yorker Mag., Inc.*
  85 F.3d 1394 (9th Cir. 1996) ............................................................. 23

*Mathew Enter., Inc. v. Chrysler Grp. LLC*
  250 F. Supp. 3d 409 (N.D. Cal. 2017) ................................................ 54

*Mattel, Inc. v. MCA Records, Inc.*
  28 F. Supp. 2d 1120 (C.D. Cal. 1998) aff'd, 296 F.3d 894 (9th
  Cir. 2002) ................................................................................... 42

*McClain v. Metabolife Int'l, Inc.*
  401 F.3d 1233 (11th Cir. 2005) ......................................................... 52

*Medisim Ltd. v. BestMed LLC*
  861 F. Supp. 2d 158 (S.D.N.Y. 2012) ................................................. 42

*Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*
  685 F.3d 1046 (Fed. Cir. 2012) .............................................. 2, 48, 54

*Nease v. Ford Motor Co.*
  848 F.3d 219 (4th Cir. 2017) ................................................ 52, 53, 54

*Prudential Ins. Co. v. Gibraltar Fin. Corp.*
  694 F.2d 1150 (9th Cir. 1982) ....................................... 25, 26

*San Diego Comic Convention v. Dan Farr Productions*
  336 F. Supp. 3d 1172 (S.D. Cal. 2018), aff'd 807 Fed.Appx. 674
  (9th Cir. 2020) .................................................... 2, 48, 54

*Sazerac Co. v. Fetzer Vineyards, Inc.*
  265 F. Supp. 3d 1013 (N.D. Cal. 2017) ............................... 44

*Scott Fetzer Co. v. House of Vacuums Inc.*
  381 F.3d 477 (5th Cir. 2004) ........................................ 25

*Simon Property Group L.P., v. mySimon, Inc.*
  104 F. Supp. 2d 1033 (June 7, 2000, S.D. Ind.) ..................... 44, 45, 46

*Skechers USA, Inc. v. Vans, Inc.*
  No. CV-07-01703, 2007 WL 4181677 (C.D. Cal. Nov. 20, 2007) ........ 44

*Trujillo v. Uniroyal Corp.*
  608 F.2d 815 (10th Cir. 1979) ..................................... 48, 50, 52

*U.S. v. Weyhrauch*
  548 F.3d 1237 (9th Cir. 2008) ....................................... 23, 52

*United States v. Ruvalcaba-Garcia*
  923 F.3d 1183 (9th Cir. 2019) ....................................... 26

*Valador, Inc. v. HTC Corp.*
  242 F. Supp. 3d 448 (E.D. Va. Mar. 15, 2017) ........................ 38

*Weinar v. Rollform Inc.*
  744 F.2d 797 (Fed. Cir. 1984) ....................................... 52

Statutes

15 U.S.C. § 1051 et seq. ................................................ 6

15 U.S.C. § 1114(a) ................................................. 55, 58

28 U.S.C. § 1291 ....................................................... 6

28 U.S.C. § 1338(a) ..................................................................... 6

Under the Lanham Act ............................................................... 55

<u>Other Authorities</u>

9th Cir. R. 3-1 .................................................................. passim

Fed. R. App. P. 4(a)(1) ................................................................ 6

Fed. R. Civ. P. 50 ........................................................... 6, 14, 15

Fed. R. Civ. P. 59 ...................................................................... 15

Fed. R. Evid. 402, 403 .............................................................. 25

Fed. R. Evid. 702 ........................................................... 16, 26, 27

## Introduction

In November 2022, after a four day trial, the jury returned a verdict finding that Appellant/Plaintiff BillFloat had not established by a preponderance of evidence that Defendants/Appellees Collins Cash and Abraham Cohen infringed BillFloat's SmartBiz Mark. [1-ER-16-17.] That verdict was heavily influenced by Defendants' deeply flawed and intentionally deceptive market survey that should never have been shown to the jury. The district court also failed to properly instruct the jury that no negative inference could be drawn from the fact that BillFloat did not present its own affirmative survey evidence. These two combined errors require reversal and remand to the district court for a new jury trial.

Having presented substantial evidence to the jury of likely confusion in accordance with this Court's *Sleekcraft* test, including evidence of actual confusion, BillFloat chose not to conduct its own market survey—a decision that should have had no influence on the jury's consideration of the evidence of confusion that was presented at trial. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). If no survey had been presented by either party, the jury would have

solely considered the confusion evidence presented by BillFloat in accordance with *Sleekcraft*, a preponderance of which supported BillFloat's claim that Defendants infringed BillFloat's SmartBiz trademark. Defendants' presentation of their own flawed and intentionally deceptive market survey from their expert Mark Keegan, however, greatly confused the issue. Thus, the district court's decision to allow that market survey was a prejudicial abuse of discretion.

Moreover, after the district court erroneously denied BillFloat's motion to exclude Defendants' flawed and intentionally deceptive survey, BillFloat moved to exclude testimony and argument that the lack of its own survey evidence gives rise to a negative inference (*i.e.*, that there is no likelihood of confusion). [2-ER-229-234.] BillFloat requested the district court issue a jury instruction that there is no such inference, which is consistent with the law. *San Diego Comic Convention v. Dan Farr Productions*, 336 F. Supp. 3d 1172, 1185 (S.D. Cal. 2018), aff'd 807 Fed.Appx. 674 (9th Cir. 2020) ("[A]lthough a confusion survey would have been helpful, [plaintiff] was under no obligation to provide one and [defendant] is incorrect in asserting that a lack of a confusion survey demonstrates that confusion is not likely."); *see also Midwestern Pet*

*Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 1054 (Fed. Cir. 2012) ("We do not infer from Nestle's failure to provide survey evidence that such evidence would be harmful, especially when there is ample evidence demonstrating likelihood of confusion."). Remarkably, and contrary to law, the district court permitted Defendants' counsel to argue a negative inference to the jury and declined to provide BillFloat's proposed instruction, despite separately ruling that Mr. Keegan could not testify that his survey showed that there is no likelihood of confusion, and that Defendants could not solicit affirmative testimony about whether BillFloat could have conducted a survey. [2-ER- 107-183, 200, 229-234.]

At trial, in direct violation of the district court's orders, Mr. Keegan testified over BillFloat's objection that his survey demonstrated no likelihood of confusion, and Defendants' counsel made three attempts to adduce testimony, over BillFloat's objections, from BillFloat's expert, Melissa Pittaoulis, about the significance of BillFloat's lack of its own survey evidence. [5-ER-1096.] Despite each objection being sustained, the jury heard Mr. Keegan's testimony and repeatedly heard the questions about BillFloat's lack of survey evidence posed to Dr. Pittaoulis, all of

which made it appear that BillFloat's confusion evidence was lacking because BillFloat did not conduct its own survey, even though no such survey is required as a matter of law. Compounding the matter even more, Defendants' counsel was then permitted to argue in his closing argument that there should be a negative inference drawn from the lack of a survey by BillFloat.

The district court's refusal to exclude Mr. Keegan's survey and his related testimony, together with the district court's failure to properly instruct the jury that no negative inference should stem from BillFloat's lack of its own market survey, greatly prejudiced BillFloat. This is not only because the jury was permitted to consider a deeply flawed and intentionally deceptive market survey, but because viewing the survey, combined with Defendants' counsel's closing arguments, instilled in the jury a false belief that BillFloat was required to produce its own market survey, which is contrary to law. If the survey had been properly excluded, the jury would have never heard about any market survey, and would have instead been left to properly determine infringement solely based on this Court's *Sleekcraft* test, which does not require or even refer to a survey. Rather, *Sleekcraft* involves weighing the following eight

factors: (1) strength of the SmartBiz Mark, (2) Defendants' use of the Smart Business Funding trademark for similar services as SmartBiz, (3) similarity of the SmartBiz and Smart Business Funding trademarks, (4) actual confusion, (5) Defendants' intent, (6) similarity of the marketing channels, (7) the consumer's degree of care, and (8) the potential for Defendants to expand their services (the "*Sleekcraft* factors") [1-ER-41-42]. *Sleekcraft*, 599 F.2d at 348-49.

BillFloat demonstrated with ample evidence at trial that each of these factors weighed in favor of finding that Defendants infringed the SmartBiz Mark. However, Defendants' unreliable survey evidence and the Court's failure to issue proper instructions greatly disrupted the jury's ability to fairly consider the *Sleekcraft* factors.

The district court, therefore, abused its discretion (i) by admitting Defendants' deeply flawed, intentionally deceptive, and highly prejudicial market survey; (ii) by permitting defense counsel to argue a negative inference attributable to BillFloat's decision to not conduct its own market survey; and (iii) by failing to provide a corrective jury

instruction.[1] The district court's non-infringement judgment should, therefore, be vacated and the case should be remanded with instructions to retry the case with Mr. Keegan's survey excluded from evidence and a proper jury instruction that no negative inference can be drawn from the a lack of a survey being presented by BillFloat.

## Statement of Jurisdiction

The district court had original jurisdiction under 28 U.S.C. § 1338(a), since this case arises under 15 U.S.C. § 1051 et seq. This appeal is from the final judgment over which this Court has jurisdiction, pursuant to 28 U.S.C. § 1291. The judgment was entered on March 1, 2023. [1-ER-2.] The notice of appeal was filed on March 15, 2023. [8-ER-1900-1903.] The Appeal is timely under Fed. R. App. P. 4(a)(1) and 9th Cir. R. 3-1.

## Statement of Issues

1. Did the district court abuse its discretion by admitting into evidence a highly flawed market survey that was intentionally designed to confuse the jury into believing there was no likelihood of confusion?

---

[1] BillFloat preserved its right to appeal these errors at trial by filing a motion for a directed verdict pursuant to Fed. R. Civ. P. 50, and renewing the motion after trial. [2-ER-75-104.]

2. Did the district court abuse its discretion by failing to instruct the jury that BillFloat was not required to submit a market survey to demonstrate likely confusion and that the lack of survey evidence did not create a negative inference that there is no likelihood of confusion, particularly when Defendants relied on a heavily flawed and misleading survey and Defendants' counsel falsely described the legal standard?

## Statement of the Case

### A.    BillFloat Builds its Valuable "SmartBiz" Brand.

BillFloat is an award winning small business loan facilitator. [6-ER-1173-1276.] Since 2013, it has offered business financing services under the SmartBiz brand. [2-ER-217.] BillFloat registered its SmartBiz Mark in 2014, and that registration has become incontestable. [*Id.*] BillFloat also registered its trademarks for SmartBiz Design, SmartBiz Loans and SmartBiz Advisor (together, the "SmartBiz Marks"). [2-ER-217-218.]

BillFloat has spent millions of dollars marketing and advertising to promote its small business funding services in connection with the SmartBiz Marks [5-ER-859-862; 5-ER-884-885; 6-ER-1159; 6-ER-1161-1168; 6-ER-1171-1172.] Through these efforts, it became the number one

facilitator in the U.S. of Small Business Administration (SBA) loans [6-ER-1223-1225], and the "#1 online marketplace for SBA loan originations of $350,000 and under." [6-ER-1188.]

### B. Collins Cash Begins Using its Similar Smart Business Funding Brand for the Same Types of Services.

Like BillFloat, Collins Cash offers the same financial services to small businesses. [2-ER-217).] Collins Cash began offering its services under the Smart Business Funding trademark in December of 2014. [*Id.*] Just like BillFloat, Collins Cash offers SBA loans, including Paycheck Protection Program (PPP) loans through third parties. [2-ER-218-219; 5-ER-932.] Both parties offer fast approval, low cost small loans. [6-ER-1171 ("Get $5,000-$25,000"); 6-ER-1191 ("loans from $30,000 to $350,000"); 6-ER-1231 ("apply for a $5,000 to $350,000").]

Both parties also cater to the same customers in the same industries, *e.g.*, auto shops, trucking and shipping companies, attorneys, accountants, dentists, doctors, retailers, restaurants and contractors. [5-ER-846-847; 5-ER-950; 5-ER-953; 8-ER-1644-1650.] Many of those customers are not sophisticated. [5-ER-907.] For example, numerous consumers requested small loans, under $5,000. [5-ER-989; 5-ER-991.] Consumers do not generally exercise significant decision-making care

when purchasing such small loans. [5-ER-907.] Thus, these types of loans do not require a high level of consumer sophistication. [5-ER-992.]

Additionally, both parties use their respective marks to advertise the same services to similar, and many times identical, small businesses in substantially the same manner, *i.e.*, through their respective websites and social media. [5-ER-889-897; 5-ER-933-36; 5-ER-939-945; 5-ER-949-950, 5-ER-1014-1015; 6-ER1143-1145; 7-ER-1375-1628; 8-ER-1644-1650; 8-ER-1888-1889.] Collins Cash's Google AdWords campaigns even include the keywords SBA loans, PPP loans, paycheck protection loans. [5-ER-891; 5-ER-949.] And, both parties have partnerships with the same companies for providing small business loans. [5-ER-847; 5-ER-895-896.]

Collins Cash has been using the Smart Business Funding trademark since 2015, but in comparison to BillFloat, Collins Cash is a much smaller business, with limited recognition and reach. Therefore, there has been little opportunity for broad-based confusion thus far. However, even though Defendants' Smart Business Funding trademark is not broadly known, Defendants' use of that mark in the same target market as SmartBiz has created actual confusion with consumers and industry participants.. [5-ER-961-966; 5-ER-973-981; 7-ER-1351-1355; 8-

ER-1652.] For example, in 2018, a customer emailed Collins Cash asking if a marketing communication from SmartBiz Loans was from Collins Cash. [5-ER-967-969; 8-ER-1652.] And, on at least one occasion, Defendants used an instance of confusion to aggressively solicit business from the consumer who contacted Collins Cash because he confused them for SmartBiz. [5-ER-973-979.] And, Collins Cash is growing significantly, further increasing the likelihood of confusion in the future.

## C.   <u>BillFloat Brings this Action to Stop Consumers from Being Confused.</u>

In April 2020, after becoming aware of Collins Cash's use of the Smart Business Funding trademark, BillFloat sent a cease and desist letter to Collins Cash demanding that it terminate use of its mark. [2-ER-219.] Instead, Collins Cash responded by applying to register the Smart Business Funding trademark with the USPTO in May 2020. [*Id.*] That same month, BillFloat sent a second cease and desist letter warning Collins Cash a lawsuit would follow should they continue to use the Smart Business Funding trademark. [*Id.*] BillFloat sent a final cease and desist letter in September 2020 [*Id*], and initiated opposition proceedings before the USPTO in October 2020.

In December 2020, BillFloat filed this lawsuit alleging that Defendants' use of the Smart Business Funding trademark constitutes, *inter alia*, trademark infringement under federal law.[2] [*Id.*]

### D. To Counter BillFloat's Confusion Evidence, Defendants' Expert Designs a Survey that is Highly Flawed and *Predetermined* to Show No Confusion.

Despite the fact that the marks are nearly identical and that there had already been evidence of actual confusion in the marketplace, Defendants engaged an attorney, Mark Keegan, to conduct a market survey to measure likelihood of consumer confusion between the marks. [5-ER-999.] BillFloat demonstrated through substantial evidence and expert testimony that Mr. Keegan used a "flawed survey design" that lacked a separate control group and proper control stimulus, and "the control stimuli that he did select and use seemed like they were selected to produce a particular desired outcome." [5-ER-1094-95.]

### E. The District Court Denies BillFloat's Motion to Exclude Mr. Keegan's Deceptive Market Survey.

In April 2022, BillFloat moved to exclude the market survey and related testimony offered by Mr. Keegan for the reasons discussed *infra*.

---

[2] BillFloat's other claims were voluntarily dismissed or dismissed by the district court prior to trial.

[2-ER-288-318.] While recognizing multiple flaws in Mr. Keegan's survey, the district court denied the motion. [1-ER-57-72.]

BillFloat then moved *in limine* to preclude Defendants from: (1) introducing any testimony or attorney argument that the absence of any market survey evidence presented by BillFloat creates an inference that such a survey would have demonstrated that there is no likelihood of confusion between Defendants' Smart Business Funding trademark and BillFloat's registered SmartBiz Marks; and (2) arguing that BillFloat could have, but did not, conduct its own market survey. [2-ER-229-234.] That motion was denied-in-part and granted-in-part on October 19, 2022. [2-ER-200.] Specifically, the district court denied BillFloat's request to preclude attorney arguments about the absence of a survey conducted by BillFloat, but granted BillFloat's request to prohibit cross-examination of BillFloat's expert, Dr. Pittaoulis, about whether she could have conducted such a survey, since such examination would have exceeded the scope of her testimony on direct examination. [*Id.*]

**F.** **The District Court Denies BillFloat's Request to Preclude Defendants from Attributing a Negative Inference to BillFloat's Decision Not to Conduct a Market Survey.**

Before trial, BillFloat also requested that the district court instruct the jury that the absence of market survey evidence does not create an inference that there is no likelihood of confusion. Such an instruction is consistent with the law. [2-ER-188 (citing *San Diego Comic Con.*, 336 F. Supp. 3d at 1185, *aff'd* 807 Fed. Appx. 674 (9th Cir. 2020); *Midwestern Pet Foods*, 685 F.3d 1046 at 1054; *Swagway, LLC v. International Trade Commission*, 934 F.3d 1332, 1340 (Fed. Cir. 2019)).] However, the district court declined to provide this instruction and expressly permitted the parties to "argue the result of Defendants' survey and lack of one from Plaintiff." [2-ER-163.]

**G.** **Defendants Present Mr. Keegan's Deceptive Market Survey to the Jury and Violate Multiple District Court Orders.**

Shortly after trial commenced, Defendants tried to introduce testimony from Mr. Keegan, in violation of the district court's prior order [1-ER-68-71], that Mr. Keegan's survey demonstrated that there is no likelihood of confusion. [5-ER-1007 ("So this is not a hard call for me. This is very clearly an indication of a lack of consumer confusion.")] BillFloat's

counsel objected and the district court instructed the jury to disregard the statement. [*Id.*] However, the jury had already heard it. Compounding the problem, during cross-examination of Dr. Pittaoulis, Defendants' counsel attempted to introduce into evidence the fact that BillFloat did not conduct a survey, but could have—testimony that was in direct violation of the district court's pretrial ruling precluding such questioning. [5-ER-1096 ("If you wanted to prepare a likelihood of confusion survey for this case, how long would it take you?"); 2-ER-198-204]. BillFloat's counsel again objected and the district court sustained the objection. [5-ER-1096.] Undeterred, Defendants' counsel asked two more questions along the same lines, which again drew objections from BillFloat that were sustained by the district court. [5-ER-1096-97.] But, the jury had heard the questions repeated yet again.

### H. **The District Court Denies BillFloat's Motions for a Judgment as a Matter of Law and a New Trial.**

At the conclusion of evidence, BillFloat moved under Rule 50 for a directed verdict that Defendants infringed the SmartBiz Mark. [5-ER-1106.] That motion was taken under submission, and before the court ruled, the jury rendered a verdict of non-infringement. [1-ER-17.]

BillFloat renewed its Rule 50 motion and also moved for a new trial pursuant to Fed. R. Civ. P. 59. [2-ER-75-104.] The district court denied both of BillFloat's motions. [1-ER-3-15.] The district court concluded that it did not err in allowing the jury to consider Mr. Keegan's flawed market survey because the jury "had sufficient information to properly evaluate the weight of Keegan's testimony" and "could have well decided to give no weight to the survey." [*Id.* at 6.] The district court further determined that "it is highly unlikely that BillFloat would have been prejudiced by any of these asserted errors" because "the jury reasonably could have found a lack of *actual* confusion." Notably, the district court did not comment on whether the jury would likely have been misled by the presence of Mr. Keegan's survey, and if so, whether they would have still likely determined there is no *likelihood* of confusion. [*Id.* at 7, 9 (emphasis added).]

## Summary of Argument

Although Court sets a low threshold for admissibility of survey evidence to demonstrate the absence or presence of confusion in a trademark infringement dispute (*Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001)), that threshold is not

bottomless. District courts *must* still abide by their gatekeeping duties mandated by the Supreme Court and the Federal Rules of Evidence by keeping unreliable expert testimony and evidence from the purview of the jury. *Daubert v. Merrell Dow Pharms*, 509 U.S. 579 (1993); Fed. R. Evid. 702. The district court failed to do so here.

Courts in this Circuit employ a two-step process for evaluating the admissibility and weight of survey evidence: (i) "is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles"; and (ii) are there "issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like." *Clicks Billiards*, 251 F.3d at 1263. The threshold question of admissibility of the survey evidence is determined at step one. *Id*. However, this Court has yet to define that threshold. It has a chance to do so here. There is little question that Defendants' survey evidence, which was not only deeply flawed, but also resulted from an intentionally defective survey design that was predetermined to favor Defendants' argument that there was no likely confusion, cannot be sufficiently reliable to pass muster under either step one of this Court's *Click Billiards* standard, or the Supreme Court's *Daubert* standard. That

is because such an intentionally biased survey ceases to be relevant or helpful to the jury because it no longer provides an objective view of likely confusion caused by Defendants' trademark. Nor did the survey comply with accepted survey design principles set by Mr. Keegan's peers and acknowledged by Mr. Keegan himself at trial [5-ER-1016; 5-ER-1036]. *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005).

Specifically, in direct conflict with accepted survey methodology, Mr. Keegan (i) surveyed an incorrect universe of respondents that did not match the profile of Defendants' consumers, (ii) employed an improper survey design that did not include a proper separate control group, and (iii) implemented purported control stimuli that resulted in an under-reporting of confusion attributable to Defendants' trademark.

First, Mr. Keegan surveyed the wrong people. He was supposed to survey likely purchasers of the Defendants' financial services to determine if they would be confused by Defendants' use of the Smart Business Funding trademark in view of BillFloat's SmartBiz Mark. But, Mr. Keegan did not even ask the right question to determine if his survey respondents were likely purchasers of Defendants' services, and clearly surveyed many individuals who were not. For example, Mr. Keegan

included pre-school teachers and farm workers in his survey with no apparent need or desire to purchase financial services. He also excluded respondents who might be likely purchasers of financial services, like business school students. Because he failed to ask the right screening questions, there is no way to tell whether any of the respondents are likely purchasers of Defendants' services.

Second, Mr. Keegan employed an improper survey design that did not include a control group. It is fundamental, basic practice for survey experts to separate their respondent pool into two groups. The first group—called the test group—is shown the Defendants' trademark as it is used in commerce, and the second group—called the control group—is shown a control stimulus that looks like the test stimulus, but replaces the Defendants' trademark with a different "control" mark. The purpose is to isolate confusion that is due to the Defendants' trademark from potential confusion from other sources. Mr. Keegan, however, only used a single group of respondents who each saw the same survey stimuli. This is an independent reason why the survey was unreliable.

Finally, Mr. Keegan failed to use a proper control stimulus at all. The control stimulus should look as much like the test stimulus as

possible, with the exception of the trademark that is displayed. Here, the test stimulus was the Smart Business Funding webpage that uses the Smart Business Funding trademark. A proper control stimulus, therefor, would have been the same webpage, but with a different trademark displayed. That is to say, the control stimulus is supposed to look like the test stimulus (in this case, the Defendants' webpage), but with different words. Mr. Keegan admitted that he could have used such a control stimulus, but intentionally chose not to do so, opting instead to use third-party webpages that looked nothing like the Smart Business Funding webpage. Even worse, Mr. Keegan pulled a switch—he used the third-party webpages that looked very similar to *BillFloat's SmartBiz webpage*, such that respondents confused the control stimuli with the SmartBiz webpage for reasons other than similarity between the trademarks. This survey design flaw predetermined a result that favored Defendants by artificially deflating Mr. Keegan's calculated confusion rate.

Worse still, Mr. Keegan is a serial generator of defective and deceptive surveys. Indeed, he designed his flawed survey with knowledge that previous surveys he designed in other cases had been excluded for exhibiting some of these very same errors, including using an incorrect

survey universe. *See Kudos Inc. v. Kudoboard LLC*, Case No. 20-cv-01876-SI, 2021 WL 5415258, *12 (N.D. Cal. Nov. 20, 2021); *VonRosenberg v. Lawrence*, et al., 413 F. Supp. 3d 437, 454-455 (D.S.C. 2019). There is no doubt, then, that he inserted the same defects in his survey in this case to produce a pre-determined result in Defendants' favor. The district court erred by allowing such intentionally unreliable expert evidence and testimony to reach the jury. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 141 (1999) (holding that the gatekeeping function described in *Daubert* applies to *all* expert testimony).

The district court's failure to exclude Mr. Keegan's survey was particularly problematic in this case because BillFloat chose not to conduct its own market survey since it recognized that it would be able to present the jury with substantial evidence of likely confusion in accordance with the Court's *Sleekcraft* test. 599 F.2d at 348-49. That test does not require market survey evidence to prove infringement. *Id*. If Defendants' survey had been properly excluded, the jury would have simply weighed the *Sleekcraft* evidence to determine infringement. Instead, the jury was incorrectly led to believe that BillFloat failed to provide a required piece of evidence—*i.e.*, a market survey—to support

its case, even though no such survey evidence was required.

Furthermore, in direct violation of the court's *Daubert* order precluding Mr. Keegan from testifying about the ultimate conclusion as to whether there was likely confusion in this case, Mr. Keegan testified at trial that his survey showed no such confusion. BillFloat's objection to Mr. Keegan's testimony was sustained, but the jury heard the testimony. Then, defense counsel repeatedly violated another court order by cross-examining BillFloat's expert about whether she could have conducted her own survey. BillFloat's objections were, once again, sustained, but the jury heard the questions.

The district court even further compounded its error by permitting defense counsel to argue in its closing argument about a negative inference attributable to BillFloat's lack of its own survey evidence and failing to issue a jury instruction that no such negative inference should be attributable to BillFloat since it was not required to submit survey evidence to prove a likelihood of confusion.

Together, these errors were highly prejudicial to BillFloat. Not only did the jury hear about an unreliable and biased market survey that was disguised as objective expert evidence, but was then led to believe

through the admission of such evidence, improper testimony from Mr. Keegan, corresponding defense counsel argument, and improper questions to BillFloat's expert, that BillFloat was required to produce its own survey evidence to support its case when no such survey was required. Without even a corrective jury instruction, the jury was unable to objectively evaluate BillFloat's evidence of confusion in view of the Court's *Sleekcraft* test. Given the weight of that evidence, in is reasonably probable that the jury would have reached a different verdict in BillFloat's favor but for the district court's series of errors.

Given the district court's errors, the final judgment in Defendants' favor should therefore be vacated and the case remanded with instructions to exclude Defendants' survey and to exclude evidence or argument that BillFloat was required to present its own survey. Doing so will not only provide long-needed guidance to courts and practitioners about where the line exists for determining admissibility of survey evidence in accordance with this Court's *Clicks Billiards* precedent, but will also dissuade survey experts from straying so far from accepted survey methodology as to present juries with intentionally misleading survey evidence, as Mr. Keegan did here.

# Legal Discussion

## A. <u>Standard of Review</u>

This Court reviews the district court's refusal to exclude evidence and formulation of jury instructions for abuse of discretion. *Masson v. New Yorker Mag., Inc.*, 85 F.3d 1394, 1397, 1398-9 (9th Cir. 1996); *Jones v. Williams,* 297 F.3d 930, 934-35 (9th Cir. 2002) (holding that a district court's formulation of civil jury instructions, including its denial of a proposed jury instruction, are reviewed for abuse of discretion). A "district court abuses its discretion when its evidentiary rulings are based on an erroneous view of the law or a clearly erroneous assessment of the facts" that prejudice the appellant. *U.S. v. Weyhrauch*, 548 F.3d 1237, 1240 (9th Cir. 2008) (citation omitted); *M2 Software*, 421 F.3d at 1087. When a district court abuses its discretion, this Court will reverse unless it finds that "the jury's verdict is more probably than not untainted by the error." *Aguilar v. City of Los Angeles*, 853 Fed. Appx. 92, 97-98 (9th Cir. 2021) (quoting *Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983)).

This Court also reviews a denial of a motion for a new trial for an abuse of discretion. *Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th

Cir. 2017) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 728 (9th Cir. 2007)). The Court may reverse the denial of a new trial when the district court "reaches a result that is illogical, implausible, or without support in the inferences that may be drawn from the record." *Id.* (quoting *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010)). "The abuse of discretion standard requires [the Court] to uphold a district court's determination that falls within a broad range of permissible conclusions, provided the district court did not apply the law erroneously." *Id.* (quoting *Kode*, 596 F.3d at 612).

## B. <u>Mr. Keegan's Deceptive Market Survey and Testimony Should have Been Excluded.</u>

Although courts in this Circuit generally admit survey evidence in trademark cases, deferring questions of evidentiary weight attributable to survey design variances to the jury, the proponent of the survey still *must* demonstrate foundation for the survey's admissibility with respect to relevance and adherence to accepted principles. *Clicks Billiards*, 251 F.3d at 1263 (citing *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir.1997); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292-93 (9th Cir. 1992)). "This threshold question may be determined by the judge." *Id*. A survey should only be admitted into evidence and shown to

the jury if its proponents have demonstrated the survey's relevance to the issue being tried and compliance with accepted principles. *M2 Software*, 421 F.3d at 1087. Survey evidence is relevant only if it has the "tendency of proving" there is or is not a "likelihood of confusion between the marks at issue." *See E & J Gallo Winery v. Proximo Spirits, Inc.*, Case No. 1:10-cv-00411 LJO JLT, 2011 WL 5922090 (E.D. Cal. Nov. 28, 2011). Consistent with that obligation, a market survey should be kept from the jury's purview "if it is irrelevant to the issues" or its probative value is outweighed by its propensity to confuse or mislead the jury. Fed. R. Evid. 402, 403; *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir. 1982) (recognizing that some cases support exclusion of survey evidence that contains self-serving questions and which fails to duplicate actual market conditions) (citing *American Foot Wear Corp. v. General Footwear Co.*, 609 F.2d 655, n.4 (2d Cir. 1980)); *see also Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488-89 (5th Cir. 2004) (rejecting plaintiff's introduction of survey evidence and ruling in favor of defendant on trademark infringement and unfair competition claims).

Any rule to the contrary is inconsistent with the Supreme Court's mandate that a district court must prevent unreliable expert testimony

from reaching the jury. *Daubert*, 509 U.S. 579; *Kumho Tire*, 526 U.S. at 141(holding that the gatekeeping function described in *Daubert* applies to *all* expert testimony). The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188-89 (9th Cir. 2019) (quoting *Kumho Tire*, 526 U.S. at 152).

Here, the district court failed to perform its gatekeeping function by permitting the jury to hear flawed testimony about a deceptive market survey *that did not comply with any accepted standard whatsoever and instead was designed to mislead the jury*. Simply put, Defendants' survey did not meet any reasonable threshold of admissibility. *Prudential*, 694 F.2d at 1156 ("Admissibility of a survey is a threshold question that must be resolved by a judge.") (citing *Clicks Billiards*, 251 F.3d at 1263). Nor did the opinions proffered by Defendants' expert, Mr. Keegan, serve to "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591; *see also ChesebroughPond's, Inc., v. Faberge, Inc.*, 666 F.2d 393, 398 (9th Cir.

1982) (affirming exclusion of expert's affidavit regarding marks' dissimilarity because it was not of any "real assistance to the trier of fact").

Prior to trial, BillFloat moved to exclude Mr. Keegan's market survey and expert testimony because his survey is deeply flawed and unreliable pursuant to *Daubert* and Fed. R. Evid. 702. [2-ER-288-318.] Even worse, Mr. Keegan designed his survey "to produce a particular desired outcome"—namely, that confusion was unlikely. [5-ER-1094-1095.] It should have been excluded.

Remarkably, Mr. Keegan has made many of these same mistakes in previous trademark surveys and has seen those surveys (and his opinions) excluded. Two of Mr. Keegan's surveys were recently excluded (one by the district court just six months prior to his submitting his expert report in this case) for using an incorrect universe of respondents that did not accurately reflect likely consumers of the products or services at issue in those cases. *See Kudos*, 2021 WL 5415258 at *12; *VonRosenberg*, 413 F. Supp. 3d at 454-455. Despite having just been chastised by multiple district courts—including one in this Circuit—for his fatally defective survey designs, Mr. Keegan repeated the same

survey design defects here by failing to survey a universe of likely consumers of the parties' small business funding services.

The district court in *Kudos* also excluded Mr. Keegan's survey for asking improper leading questions. 2021 WL 5415258 at *12. Shockingly, Mr. Keegan admitted at deposition that, even after he had reviewed the district court's exclusion order in *Kudos*, he made the same error in the survey presented in this case by twice asking the same type of flawed leading question that the district court found sufficiently defective in *Kudos* to exclude his survey. Mr. Keegan's conduct demonstrates a complete disregard for the court, the legal standard for conducting reliable surveys according to accepted principles, or both.

Nonetheless, despite two courts, including one in this Circuit, having excluded Mr. Keegan's surveys for these same types of flawed designs, the district court here improperly denied BillFloat's motion to exclude Mr. Keegan's survey, surmising instead that the flaws in Mr. Keegan's survey went to the weight of the evidence, not its admissibility. [1-ER-68-71.] The district court was wrong and abused its discretion in doing so because the survey here was so deeply flawed that it had no evidentiary value. Rather, the defective survey merely confused the jury

and prejudiced BillFloat because the jurors were misled into believing that BillFloat's decision not to conduct its own survey somehow supported an inference that there was no confusion. Mr. Keegan's survey should never have been shown to the jury. [2-ER-242-262; 2-ER-288-318.]

This Court's opinion in *M2 Software* is highly instructive. 421 F.3d at 1087. The district court in that case excluded a market survey because, among other things, its proponent failed to show that the survey was performed in accordance with "generally accepted survey principles and that the results were used in a statistically correct manner." *Id.* (citing *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988) (noting that the proponent of the survey has the burden of demonstrating that the survey was conducted in accordance with generally accepted principles)). This Court affirmed. And, in *FTC v. Commerce Planet, Inc.*, this Court relied on its decision from *M2 Software* to affirm the district court's exclusion of a consumer survey because the survey was conducted by a third-party and the testifying expert could not "demonstrate that the survey was conducted according to accepted principles." 815 F.3d 593, 604 (9th Cir. 2016) (citing *M2 Software*, 421 F.3d at 1087).

Just like the properly excluded surveys in *M2 Software* and *FTC v. Commerce Planet*, Defendants here failed to demonstrate that Mr. Keegan's survey met the threshold for admissibility because the survey was not performed according to *any* accepted standards and was infected with numerous design defects, many of which were intentionally inserted to skew the survey's results in Defendants' favor. Specifically, Mr. Keegan: (i) employed an improper universe of survey respondents, many of whom were not likely customers for Defendants', while at the same time, excluding whole classes of consumers that would be likely purchasers of Defendants' services; (ii) implemented a deeply flawed survey design that did not mirror *any* well accepted survey design used for confusion surveys; and (iii) failed to use proper control stimuli, resulting in an under-reporting of net-confusion that artificially supported a non-confusion verdict. Each of these significant flaws, which are described below in more detail, rendered Mr. Keegan's survey so unreliable that it should have never been admitted or shown to the jury.

1.    **Mr. Keegan used an improper survey universe.**

Mr. Keegan's survey should have been excluded because, it used an improper universe that rendered it completely unreliable. "Survey

Universe" (or "Survey Population") is the group of individuals that the results of the survey are intended to represent. [5-ER-1069.] "Selection of a proper universe is a crucial step, for even if you ask the proper questions in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." (8-ER-1721-1759.) If a survey does not include the proper screening questions, it can be both underinclusive (exclude relevant consumers) and overinclusive (include individuals who are not consumers of the relevant services). [5-ER-1078.] Though defects in a survey universe typically affect weight and not admissibility of a survey, courts may declare a survey inadmissible if the responses of the surveyed universe are irrelevant to the opinions of the universe at issue. McCarthy on Trademarks and Unfair Competition § 32:162 (5th ed.; *see also Icon Enters. Int'l, Inc. v. Am. Prods. Co.*, No. CV 04-1240 SVW, 2004 WL 5644805, *25 (C.D. Cal. Oct. 7, 2004).

Here, the relevant universe for likelihood of confusion survey is the Defendants' target market. [5-ER-1078.] In his report, Mr. Keegan claimed that his universe would be likely purchasers of small business financing. [5-ER-1017; 5-ER-1078.] However, Mr. Keegan failed to ask the right questions to identify that audience, making his universe both

overinclusive and underinclusive. [5-ER-1082.] A survey universe is overinclusive if it encompasses a large group of persons whose perceptions are not relevant. McCarthy at § 32:161. Introduction of irrelevant perceptions skews surveys results by introducing irrelevant data. *Id*.; *Citizens Fin., Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 120 (3d Cir.2004) ("If the universe is skewed, then the conclusion will similarly be skewed."). Therefore, highly skewed surveys should be excluded because a jury is likely to give "special weight" to results presented by an expert with specialized scientific knowledge. *Id*. For this reason, an overinclusive survey universe may also warrant exclusion. *Kournikova v. General Media Communications, Inc.*, 278 F. Supp 2d 1111, 1125 (C.D. Cal. 2003) (excluding survey where only 25% of surveyed universe actually comprised consumers of the defendant's products).

        a.     *Mr. Keegan failed to ask questions to determine if his survey respondents were likely purchasers of Defendants' services—who are these people?*

Mr. Keegan did not ask *any* screening questions that would allow him to identify people who belong to the desired universe of purchasers of small business financing. [5-ER-1078.] Mr. Keegan should have asked

questions about the types of small business financing that respondents would have considered. [*Id*.] As part of his screening questions, Mr. Keegan also should have asked whether the respondents were currently in the market for small business financing, whether they expected to be in the market for small business financing in the near future, or whether they ever applied for small business financing. [5-ER-1079-80.] He did not. Consequently, none of the questions ever determined whether *any* of the respondents were likely purchasers of small business financing. Instead, Mr. Keegan posed hypothetical questions to respondents—regardless of whether or not they were actual or likely purchasers of small business funding services at all—and prompted them to speculate as to whether they *would* be decision makers, regardless of their company's need for such services. [5-ER-1080; 8-ER-1768.] That question asks:

> *Suppose* you become aware of a financial services provider that offers small business financing to organizations like your company or organization. How would you describe your involvement in the decision as to whether your company or organization applies for small business with this financing services provider.

[8-ER-1768 (emphasis added).] The respondent was then given the options:

> I *would* make that decision on my own
> In combination with others, I *would* make that decision.
> I *would* influence that decision
> I *would* not be involved in making or influencing that decision
> I am not sure

[*Id.* (emphasis added).] This question not only improperly flagged for respondents how they could qualify for the survey (*i.e.*, by being a decision maker for the purchase of financial services), but also improperly invited respondents to speculate about what they might do in a hypothetical scenario. [5-ER-1080-1081.]

The defect in Mr. Keegan's survey can be shown with an analogy for a survey involving snow tires, which naturally involves using a survey audience of actual or likely buyers of snow tires. In a Keegan-like survey, respondents from the general public are never asked if they are actual or likely purchasers of snow tires. Instead, in a Keegan-like survey, respondents from the general public are asked to *suppose* that they are offered snow tires and whether they *would* be the decision maker in the purchase. Such a question necessarily elicits a speculative answer even if the respondent does not have a car, or does not intend to buy a car, or never drives in snow, or lives in Phoenix. Similarly, here, even if one of Mr. Keegan's survey respondents did not work with a company in the

market for financial services, the respondent was still asked to speculate as to whether they *would* be a decision maker for such services *if* they did work for such a company. Thus, the question elicits speculative responses and wholly fails to screen for actual likely purchasers of Defendants' services. [*Id.*]

Mr. Keegan also failed to identify respondents who would be likely purchasers of Smart Business Funding's services, which is a subset of small business funding. [5-ER-1082.] Mr. Keegan should have asked respondents whether they had used, or would be interested in, any of specific types of financing that Smart Business Funding provides. [*Id.*] Instead, Mr. Keegan included services not provided by Smart Business Funding. [*Id.*]

By failing to ask the right questions, Mr. Keegan's universe is overinclusive because it includes people in the survey who should not have been part of the survey, *i.e.*, people who are not decision makers and/or are not small business funding purchasers for the types of products that Smart Business Funding offers. [5-ER-1082-83.] For example respondents included the following: teacher, kindergarten and preschool in Montessori environment, data recorder, secretary, farm

hand, mail handler, key holder, and good service, despite not asking any questions about whether they are likely purchasers of Smart Business Funding services. [5-ER-1026-27; 5-ER-1084-85; 5-ER-1838-1843.] Mr. Keegan admits he does not know what a "key holder" is, but still included the person in his survey. [5-ER-1027] Because Mr. Keegan did not ask questions to identify the correct respondents, the extent of this over inclusiveness cannot be analyzed and determined. [5-ER-1084; 8-ER-1675.] It could be that *none* of the respondents were properly included in the survey. For this reason alone, the district court should have excluded Mr. Keegan's survey. *See Kournikova*, 278 F. Supp 2d at 1125 (excluding a market survey in which only 25% of the respondents were likely purchasers of the junior user's goods).

> b.     *Mr. Keegan also improperly excluded respondents that were likely purchasers of Defendants' services.*

Mr. Keegan's survey is also potentially underinclusive, because the survey improperly excluded respondents that may be potential purchasers of Collins Cash's services on the basis that these respondents self-identified, primarily, as students, home-makers, and/or retired. *See* McCarthy at § 32:161(A survey is underinclusive if it leaves out a group of persons whose perception is relevant.); [5-ER-1018; 5-ER-1023-1024;

8-ER-1655-1720; 8-ER-1769.] However, respondents in each of these categories may well be considering starting a small business and thus may be likely purchasers of business financing services. Mr. Keegan did not ask them and excluded them automatically. Mr. Keegan did this even though he admitted that full time business students, home makers, and retirees may be likely purchasers of small business financing services. [5-ER-1019, 1024.] Mr. Keegan also improperly excluded respondents that self-reported they owned, worked for, or were self-employed at a company having more than 100 employees or earning a monthly revenue outside the range of $5,001 to $1,000,000. [5-ER-1028; 5-ER-1030-1031; 8-ER-1766-1767.] There is no support for this definition of a small business. Small business size standards, stated in terms of number of employees and/or annual receipts, may vary by industry or state. And, Mr. Keegan was aware that Defendants provide services to businesses of any size, even those earning a revenue outside the range of $5,000 to $1 million per month. [5-ER-1028.] Thus, Mr. Keegan's survey is also potentially underinclusive, although we cannot know because Mr. Keegan never asked the right screening questions. A survey using a severely underinclusive universe has at best limited probative value and may

even be "worthless" because it does not accurately measure the likelihood of confusion. *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 461 (E.D. Va. Mar. 15, 2017) (*citing Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 531 (7th Cir. 2003)) (finding a survey universe severely underinclusive because it failed to cover the "prime market" for defendant's products). In other words, to have an opinion relevant on trademark confusion, the respondents polled must "include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980). Again, however, we have no way of knowing whether any of the respondents in Mr. Keegan's survey were properly included or properly excluded, because Mr. Keegan failed to ask the correct questions.

As mentioned above, this is not the first time Mr. Keegan has made this same exact mistake and courts have repeatedly excluded his surveys because of it. For example, just six months before he submitted his report in this case, the district court excluded one of Mr. Keegan's prior reports for failure to survey an appropriate universe. *Kudos*, 2021 WL 5415258 at *12 ("[T]he survey universe was 'under-inclusive in that it excluded otherwise qualified consumers, arguably some of the most likely

consumers to have knowledge of the products at issue.'") (quoting *Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC*, No. 1:16-cv-949, 2021 WL 2185699, at *18 (N.D. Ga. May 28, 2021)). Mr. Keegan surveyed "current users" of "employee recognition and engagement software" instead of prospective purchasers of the junior user's products. *Id.* at *11. Mr. Keegan also failed to "ask about purchase intentions" when selecting his respondents. *Id.* at *12. He only allowed respondents who self-identified as current users of employee recognition and engagement software to participate in the survey, excluding potential customers of the junior user and also over-including existing users of "employee recognition software." *Id.* Mr. Keegan's survey in another case was also excluded for surveying an underinclusive universe in *VonRosenberg*, 413 F. Supp. 3d at 454-455.

These flaws highlight the complete unreliability of the survey. [5-ER-1086.] Indeed, Mr. Keegan even agreed that a survey that uses the wrong universe—overinclusive or underinclusive—is unreliable. [5-ER-1016.]

## 2. Mr. Keegan used a fatally flawed survey design that did not include a control group.

Mr. Keegan's survey should also have been excluded because it used a flawed design. Mr. Keegan claims to have used a "Squirt" survey. [5-ER-1014.] When properly designed, a Squirt survey can be appropriate in contexts like this one in which the parties are competitors. [*Id.*] In a Squirt survey, respondents are each shown stimuli from both the plaintiff and defendant in order to expose them to both of the brands. [5-ER-1086.] Respondents are then asked close-ended questions about the relationship between those two companies. [*Id.*] A proper distracter stimulus is required to take the spotlight off the defendant's product. [*Id.*] There also should be a test-control experimental design, with half of the respondents in a test group and half in a control group. [*Id.*] Mr. Keegan admitted that surveys typically divide respondents into test and control groups. [5-ER-1036.] The control group is used to eliminate noise from the survey. McCarthy at § 32:187 (5th ed.)); [5-ER-1087.]

Here, Mr. Keegan's survey design had no control group and instead lumped all respondents into a single group. Thus, all respondents viewed the Smart Business Funding website and the same third-party "control" webpages for SmartBank, Bizloans, and Pursuit SmartLoan. [5-ER-

1088.] Mr. Keegan admitted this during trial. [5-ER-1036.] As such, the survey deviated substantially from accepted Squirt survey design methodology and was, therefore, unreliable.

This is another reason Mr. Keegan's survey was grossly unreliable and should have been excluded.

### 3. Mr. Keegan's survey lacked a proper control stimuli.

Mr. Keegan's survey should also have been excluded because it failed to include proper control stimuli. "In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." McCarthy at § 32:187; [5-ER-1036-1037; 5-ER-1089; 8-ER-1695.] The purpose of a control is to measure the effect of the question wording and anything about the stimuli that may cause people to think that they are from the same company *other than the names*. [5-ER-1088-9.] For example, colors, graphics or other text on the page should not change between the test stimulus and the control stimulus. [5-ER-1089.] While lack of a control group, alone, does not render a survey inadmissible in the Ninth Circuit, it is another factor courts consider

when determining whether a survey is flawed. *See, e.g., Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1133 (C.D. Cal. 1998) aff'd, 296 F.3d 894 (9th Cir. 2002); *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 178 n.149 (S.D.N.Y. 2012) (explaining that the use of a control group is the "gold standard" for eliminating survey responses due to a respondent's pre-existing beliefs and other background noise); *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), *22, 2020 WL 1503452, *7 (S.D.N.Y. Mar. 20, 2020) (excluding survey for failure to include control group, among other defects).

In this case, the characteristic being assessed was the name "Smart Business Funding" so a proper control *would have been identical to Defendants' webpage* but with the name "Smart Business Funding" changed to one that was not being alleged to be infringing. [5-ER-1089-90.] It is standard practice to isolate confusion attributable to the name. [5-ER-1090.] Mr. Keegan did not do that. Instead, Mr. Keegan used various third-party webpages as controls that looked nothing like the Smart Business Funding webpage. Worse, Mr. Keegan flipped the comparison to look like BillFloat's website. In particular, the webpages used by Mr. Keegan had the same color schemes and layout as BillFloat's

SmartBiz webpage, instead of using the same color and layout as Defendants' Smart Business Funding webpage. As such, as explained in more detail below, Mr. Keegan's third-party webpage "controls" failed to isolate confusion attributable to the Smart Business Funding name because respondents actually confused those third-party webpages with the SmartBiz webpages based on their similar colors, graphical appearances, and themes.

Mr. Keegan's survey first showed the SmartBiz webpage ("PAGE A") to the same group of respondents, followed by an array of four different webpages. [5-ER-1090-1; 8-ER-1772.] After seeing the array, the same group of respondents went back and looked at the SmartBiz page again, before answering the same series of questions for each of the individual webpages. [5-ER-1091-2.] Mr. Keegan should have used a separate group that sees the same set of four webpages, but the Smart Business Funding page would have looked the same, except with a different name in the group that is shown the control. [5-ER-1091.]

The test stimuli was the Smart Business Funding page. [5-ER-1093; 8-ER-1772.] Mr. Keegan's controls failed to share sufficient characteristics with the test mark. Courts have criticized surveys in cases

where the control failed to share sufficient, non-infringing characteristics with the test stimulus. *Skechers USA, Inc. v. Vans, Inc.*, No. CV-07-01703, 2007 WL 4181677, *8-9 (C.D. Cal. Nov. 20, 2007) (finding control shoe lacking shared features with test stimulus "useless" in eliminating explanations for respondents" confusion other than the allegedly infringing feature); *see also Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1026-1027 (N.D. Cal. 2017) (affording survey no weight because, in addition to other flaws, the "survey used an improper control in that it was not as similar to the allegedly infringing product as possible with only the allegedly infringing aspect removed."); *see also Simon Property Group L.P., v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1044, 1046-47 (June 7, 2000, S.D. Ind.) (finding "commercial use of the name 'Simon' is not unique" and "refusal to include as a control here some other variations of web sites that include the name 'Simon'" was improper and grounds for exclusion). His control pages did not share the same yellow, blue, and black color scheme as the Smart Business Funding page. [5-ER-1039-1041, 1045-1046; 8-ER-1775-1792.] Additionally, the layouts and the services differed, with all of the control pages discussing loans,

when the Smart Business Funding page never once uses the word "loans." [5-ER-1048; 8-ER-1775-1792.]

In fact, the bad survey data was deliberately generated by Mr. Keegan as he knowingly selected controls that differ substantially from the test stimulus and share similarities with the SmartBiz name and webpage, even though he admitted knowing that his controls *should have, and could have, shared as many characteristics* with the Smart Business Funding webpage as possible, except for the Smart Business Funding name. [5-ER-1039-1042.] It is clear, then, that he intentionally selected his controls to produce confusion with SmartBiz's website, thereby inflating the level of noise associated with the controls, and deflating the level of "net confusion" associated with the test stimulus. [*Id.*] For example, BizLoan and SmartBank each overlap with BillFloat's mark, SmartBiz. Also, though the Pursuit name does not overlap, that control page repeatedly highlights a "Smart Loan" offering. [5-ER-1050.] The SmartBiz page and all three control pages repeatedly use the word "loan" and variants while the Smart Business Funding Page does not. [5-ER-1048-1051.] In fact, for each of the Pursuit, SmartBank, and BizLoans webpages, there were several respondents who indicated they

thought the same company put out the control webpage and the SmartBiz webpage because those webpages referred to "loans." [8-ER-1878-1885.]

Additionally, the controls share other features with the SmartBiz page, as opposed to the Smart Business Funding page (as would have been proper), including color schemes and layout. [5-ER-1039-1041.] The SmartBiz, Pursuit and BizLoans all share a white, green, and blue color scheme. [*Id.*] Many respondents identified layout and color type features as the reason they thought the control stimuli were put out by or affiliated with the same company as SmartBiz. [5-ER1046-1048; 8-ER-1878-1885.] By using control stimuli that improperly shared substantial features with BillFloat's SmartBiz webpage, but that were not shared with the test stimulus (*i.e.*, Defendants' webpage), Mr. Keegan's survey improperly queued respondents to identify the control stimuli as being affiliated with the senior mark, which will deflate the net confusion rate Mr. Keegan calculated.

Finally, Mr. Keegan did not isolate the trademark components at issue through use of his controls, causing the controls to be invalid noise measures because (1) they were selected to produce trademark confusion and (2) they share extensive characteristics with the senior (not junior)

user's marks. [5-ER-1092-1093.] This inflated the confusion rate associated with the controls, and thus, reduced the net confusion rate Mr. Keegan reported. [5-ER-1094.] BillFloat's expert, Dr. Melissa Pittaoulis, confirmed that Mr. Keegan's control stimuli appeared to have been selected "to produce a particular desired outcome." [5-ER-1094-5.]

As the evidence has shown, the survey is entirely unreliable because it does not produce valid estimates of net confusion, and it should be excluded. Even worse, Mr. Keegan's use of control stimuli that looked more like BillFloat's webpage than Defendants' webpage infected the survey by creating a predetermined bias in favor of Defendants' theory that there was no confusion.

Making matters worse, the district court exacerbated the impact of its admission of Defendants' deceptive market survey into evidence by permitting Defendants' counsel to argue a negative inference to the jury attributable to BillFloat's lack of survey evidence. [2-ER-200.] That is because, by admitting Defendants' survey, the jury had already been led to believe that BillFloat—who carried the burden of proof in this case with substantial evidence of likely confusion in accordance with this Circuit's *Sleekcraft* test—was required to offer its own survey, even

though Defendants' survey was unreliable and BillFloat had offered evidence supporting a finding of infringement. Defendants' closing argument that the jury should infer such a conclusion [5-ER-1115-6] no doubt cemented this incorrect belief in the minds of the jurors. Simply put, the jury should never have seen a market survey in this case at all because BillFloat did not, and was not required to present one, and Defendants' survey was highly unreliable and designed to produce a skewed result in Defendants' favor.

C. **The District Court Should Have Instructed the Jury that No Consumer Survey Was Required to Show Likely Confusion.**

Adding to its error of admitting Defendants' fatally flawed and unreliable survey, the district court declined to instruct the jury that BillFloat was not required to conduct its own market survey, and that the lack of a survey does not support an inference that there is lack of confusion, even though the law does not require a survey to prove infringement. [2-ER-163]; *San Diego Comic Con.*, 336 F. Supp. 3d at 1185; *Midwestern Pet Foods*, 685 F.3d at 1054; *see also Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 819 (10th Cir. 1979) (reversing the case where court's failure to give instructions and exclusion of evidence was

not harmless error). In fact, this Court's *Sleekcraft* test used to determine whether there is a likelihood of confusion sufficient to support an infringement claim does not even mention consumer survey evidence. [1-ER-41-42 ("(1) strength of the SmartBiz Mark, (2) Defendants' use of the Smart Business Funding trademark for similar services as SmartBiz, (3) similarity of the SmartBiz and Smart Business Funding trademarks, (4) actual confusion, (5) Defendants' intent, (6) similarity of the marketing channels, (7) the consumer's degree of care, and (8) the potential for Defendants to expand their services") (citing *Sleekcraft*, 599 F.2d at 348-49).]

Further, despite the fact that the district court issued orders (i) precluding the Defendants from introducing any testimony or attorney argument that the absence of any market survey evidence presented by BillFloat creates an inference that such a survey would have demonstrated that there is no likelihood of confusion [5-ER-198-204], and (ii) Mr. Keegan from expressing a legal opinion on the likelihood of confusion [1-ER-57-72], Defendants still attempted to do so. For example, during the direct testimony of Mr. Keegan, in direct violation of the district court's order, he stated "this is not a hard call for me. This is very

clearly an indication of a lack of consumer confusion." [5-ER-1007]; *see* [1-ER-57-72]. BillFloat's objection was sustained. [5-ER-1007.] However, the jury had already heard it.

Even worse, during its cross-examination of Dr. Pittaoulis, Defendants' counsel asked her "if you wanted to prepare a likelihood of confusion survey for this case, how long would it take you?" [5-ER-1096.] BillFloat's counsel again objected and the district court sustained the objection. [*Id*.]. Then, a few minutes later, Defendants' counsel asked "[d]oes this case lend itself to the use of a survey?" [*Id*.]. BillFloat's counsel objected yet again and the district court sustained the objection. [*Id*.]. But, the jury had already heard them yet again.

All these factors likely led the jury to believe that a survey was required, and that the lack thereof, indicated lack of confusion. And, each of these prejudicial events were sparked by the district court's initial error of admitting Mr. Keegan's flawed and deceptive market survey. If the survey had been excluded, Mr. Keegan would not have testified about his ultimate purported conclusion of law that the survey unequivocally demonstrated a lack of confusion (which, of course it did not), nor would Defendants' counsel have been able to infer to the jury through improper

questioning of Dr. Pittaoulis that BillFloat was required to perform its own survey (no such requirement exists). And, compounding matters, even though the jury had heard Mr. Keegan's improper testimony and defense counsel's improper questions to Dr. Pittaoulis, the district court, nevertheless, refused BillFloat's pleas to instruct the jury that no negative inference should be attributed to BillFloat's lack of survey evidence since BillFloat was not required to provide its own survey evidence to prove its case.

Thus, despite the fact that all evidence favors a finding of infringement, the jury disregarded the weight of the evidence. Consequently, the district court's failure to instruct the jury that BillFloat was not required to submit a market survey compounded the court's error of admitting Defendants' flawed survey in the first place.

D. **The District Court's Evidentiary And Instructional Decisions Prejudiced BillFloat.**

1. **The Survey Evidence And Lack of Instruction Regarding Any Negative Inference Left the Jury to Speculate About Factors Irrelevant to *Sleekcraft*.**

When a district court erroneously admits evidence, like Mr. Keegan's flawed confusion survey, and fails to properly instruct the jury,

such errors should be reversed as an abuse of discretion. As it is reasonably probable that the jury would have returned a more favorable verdict to the appellant absent the error. *Martinez v. Ylst*, 951 F.2d 1153 at 1155; *Weyhrauch*, 548 F.3d at 1240; s*ee Weinar v. Rollform Inc.*, 744 F.2d 797, 808 (Fed. Cir. 1984) (defining "prejudicial" error in context of jury instruction as one that is "not 'harmless'"); *see also Nease v. Ford Motor Co.*, 848 F.3d 219, 234 (4th Cir. 2017) (reversing the district court's denial of defendant's post-trial motion for judgment as a matter of law where expert testimony should have been excluded); *Trujillo*, 608 F.2d at 819 (reversing the case where court's failure to give instructions and exclusion of evidence was not harmless error); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (reversing and remanding where the trial court abused its discretion both by abdicating its gatekeeper responsibilities and by admitting the expert testimony at trial.). That is exactly what happened here.

As explained, *supra*, Defendants' deceptive and unreliable market survey had absolutely no tendency to demonstrate whether there was (or was not) a likelihood of confusion. The district court, nevertheless, admitted into evidence Mr. Keegan's deeply flawed market survey and

his related testimony, and in so doing, the Court incorrectly dismissed every argument raised by BillFloat as going to weight, not admissibility. [*See* 1-ER-57-72.] Making no reliability findings and admitting a survey that was actually designed to show no confusion, the district court left the jury to speculate about factors irrelevant to *Sleekcraft*. The district court's error was compounded by Mr. Keegan's testimony, in violation of a court order, that his flawed survey actually did show no confusion (which, of course, was expected). Those errors were, then, further compounded by the defense counsel's questioning of Dr. Pittaoulis about her ability to perform a survey, again, in violation of a court order, and the district court's refusal to stop defense counsel's closing argument that the absence of such survey should attribute a negative inference to BillFloat. But for these errors, it is reasonably probable that the jury would have weighed the evidence in view of *Sleekcraft* in BillFloat's favor. Thus, the district court abused its discretion by abandoning its gatekeeping function. *Nease*, 848 F.3d 219 at 230 (the court may not abandon gatekeeping function).

The fact that an expert witness was "subject to a vigorous cross-examination" does not ensure the reliability of the expert's testimony [1-

ER-3-15], as the same must still be assessed before it is presented to the jury. *Nease*, 848 F.3d 219 at 229 (citing *McClain*, 401 F.3d at 1238.) By failing to perform its gatekeeping duty and properly instruct the jury, the district court cast a false shadow on BillFloat's own evidence of likely confusion under *Sleekcraft* by making it appear that BillFloat also needed a market survey to prove its case. The law says otherwise. *See*, *supra*, *San Diego Comic Con.*, 336 F. Supp. 3d at 1185; *Midwestern Pet Foods*, 685 F.3d at 1054.

This misconception by the jury was aggravated by the fact that the district court declined to instruct the jury that the absence of a survey conducted by BillFloat should not lead to a negative inference (*i.e.*, that such a survey would have demonstrated no confusion). [2-ER-163.] "In evaluating whether a particular jury instruction was erroneous, the court must consider the jury instructions as a whole, and whether they 'fairly and adequately cover the issues presented, correctly state the law, and are not misleading.'" *Mathew Enter., Inc. v. Chrysler Grp. LLC*, 250 F. Supp. 3d 409, 414 (N.D. Cal. 2017) (quoting *Duran v. City of Maywood*, 221 F.3d 1127, 1130 (9th Cir. 2000)).

Here, it was not harmless error when the district court failed to give

an instruction to correct the jury's legally erroneous focus on Defendants' wholly unreliable survey and the inference about BillFloat's lack of survey evidence. Rather, the district court's error substantially prejudiced BillFloat because it allowed the jury to continue to focus on irrelevant survey evidence and the wrong legal standard, as opposed to properly considering the *Sleekcraft* factors—none of which refer to a requirement to conduct a market survey. *See Sleekcraft*, 599 F.2d at 348-49.

Indeed, an objective analysis of the evidence presented at trial in view of the *Sleekcraft* factors permits only one reasonable conclusion—Defendants infringed BillFloat's SmartBiz Mark.

> **2. The Clear Weight of the Evidence Demonstrating Infringement Shows It Was Reasonably Probable That the Jury Would have Reached a Different Result in the Absence of Error.**

Under the Lanham Act, to prove that Defendants were liable for trademark infringement, BillFloat had to prove it owned a valid trademark and that Defendants' use of the Smart Business Funding trademark is likely to cause confusion among consumers. 15 U.S.C. § 1114(a). The district court properly instructed the jury that BillFloat's registration of the SmartBiz Mark with the USPTO provides conclusive

evidence that it owned a valid trademark. Then, to evaluate likelihood of confusion, the jury was instructed to weigh the eight *Sleekcraft* factors. As explained below, BillFloat demonstrated with ample evidence that each *Sleekcraft* factor weighs in favor of finding confusion between the respective trademarks.

### a.    Strength or weakness of the SmartBiz Trademarks

"The more the consuming public recognizes the Plaintiff's trademark as an indication of origin of the Plaintiff's services, the more likely it is that consumers would be confused about the source of the Defendants' services if the Defendants use a similar mark." [1-ER-41-42.]

The evidence showed that the SmartBiz Mark is strong and very recognizable. [5-ER-856-859; 6-ER1121-1140.] First, as to commercial strength, for many years, BillFloat has spent several hundreds of thousands of dollars per month in marketing and advertising costs to promote its services and to develop its brand. [5-ER-859-862; 5-ER-884-885; 6-ER-1159; 6-ER-1161-1168; 6-ER-1171-1172.] To promote the brand, BillFloat also attends many industry tradeshows yearly. [5-ER-892.] BillFloat has also received significant unsolicited media coverage, leading SmartBiz to be recognized as the nation's number one facilitator

of SBA loans and online market place for SBA loans originations ($350,000 and under) and for its outstanding customer satisfaction ratings, and to obtain many awards for its business. [5-ER-885; 6-ER-1173-1276.] Therefore, the "strength" factor easily favors BillFloat.

b. *Defendants' use of the Smart Business Funding Trademark*

"If the Defendants and Plaintiff use their service marks on the same, related, or complementary kinds of services there may be a greater likelihood of confusion about the source of the services than otherwise." [1-ER-41-42.]

Here, the evidence showed that the parties directly compete by offering the same financial services to their customers (i.e., financing and loans to small businesses). [2-ER-217; 5-ER-844-849; 5-ER-868; 5-ER-916-917; 5-ER-932-933; 5-ER-1014-1015; 6-ER-1141-1145; 6-ER-1148-1158; 6-ER-1171-1172; 6-ER-1373-1374; 6-ER-1378-1379; 6-ER-1635-1643; 6-ER-1644-1650.] And, that the parties' services overlap substantially. [5-ER-857; 5-ER-885-889.] Collins Cash offers SBA loans, PPP loans, and paycheck protections loans through third parties [5-ER-932], as shown by its trademark application filed with the USPTO, specifying its services, among others, as "[f]inancing and loan services"

and "[p]roviding working capital financing to small businesses and small business owners." [2-ER-219.] Similarly, BillFloat's SmartBiz Marks specify their services as "[f]inancing and loan services" and "[f]inancing loans for small businesses." [2-ER-218-219.] That is, both parties offer fast approval, low cost small loans. [6-ER-1171 ("Get $5,000-$25,000"), 1191 ("loans from $30,000 to $350,000"), 6-ER-1231 ("apply for a $5,000 to $350,000").]

Both parties also cater to the same customers in the same industries, *e.g.*, auto shops, trucking and shipping companies, attorneys, accountants, dentists, doctors, retailers, restaurants and contractors. [5-ER-846-847; 5-ER-950; 5-ER-953; 8-ER-1644-1650.] Not only is there substantial customer overlap between the parties' customers here, but, in fact, many of the parties' customers are identical. [*Id.*]

Further, both parties use their respective marks to advertise the same types of financial services to similar, and many times identical, small businesses in substantially the same manner, *i.e.*, through their respective websites and social media. [5-ER-889-897, 933-936, 939-945, 949-950, 1014-15; 6-ER-1143-1145; 8-ER-1888-1889.] Collins Cash's Google AdWords campaigns even include the keywords SBA loans, PPP

loans, paycheck protection loans. [5-ER-949.] And, both parties have partnerships with many of the exact same companies for providing small business loans. [5-ER-847, 895-896.]

### c. Similarity of the Marks

"If the overall impression created by the Plaintiff's service mark in the marketplace is similar to that created by the Defendants' service mark in appearance, sound or meaning, there is a greater chance that consumers are likely to be confused by Defendants' use of a mark. Similarities in appearance, sound or meaning weigh more heavily than differences in finding the marks are similar." [1-ER-41-42.]

Here, SmartBiz and Smart Business are nearly identical in sound, appearance, and connotation, and they share the same dominant term— "Smart." [6-ER-1143-1147, 1171-1172; 7-ER-1351-1628; 8-ER-1653, 1888-1899.] Funding only describes the services being provided by both companies. Additionally "biz" is short for business. [5-ER-981 (Mr. Cohen testified that "SmartBiz" is "shorthand" for "Smart Business Funding.").] Even respondents to Defendants flawed surveyed indicated that the names are the same. [8-ER-1878-1885.]

### d. Evidence of actual confusion

"If use by the Defendants of Smart Business Funding trademark

has led to instances of actual confusion with Plaintiff's SmartBiz Marks, this strongly suggests a likelihood of confusion. However actual confusion is not required for a finding of likelihood of confusion. Even if actual confusion did not occur, the Defendants' use of the Smart Business Funding trademark may still be likely to cause confusion." (emphasis added). [1-ER-41-42.]

Here, Collins Cash itself was small enough that one might expect little opportunity for actual confusion. However, because Collins Cash deployed its Smart Business Funding mark in the exact same market to some of the same customers as SmartBiz, *real instances of actual confusion did occur* for consumers and partners. [5-ER897-898, 961-966, 973-981; 7-ER-1351-1355; 8-ER-1651-1652.] For example, in 2018, a customer emailed Collins Cash asking if a marketing communication from SmartBiz Loans was from Collins Cash. 5-ER-969; 8-ER-1652.] And, on at least one occasion, Defendants used the instance of confusion to aggressively solicit business from the consumer who contacted Collins Cash because he confused them for SmartBiz. [5-ER-973-979.] Although Collins Cash is a much smaller entity than BillFloat, meaning that there has not yet been substantial opportunity for confusion, Collins Cash has

been steadily growing over the past years from earning thousands of dollars to millions, thus dramatically increasing the likelihood of confusion moving forward. [5-ER-957, 960.]

### e. Defendants' intent

"Knowing use by Defendants of a mark confusingly similar to the Plaintiff's mark to identify similar services may strongly show an intent to derive benefit from the reputation of the Plaintiff's mark, suggesting an intent to cause a likelihood of confusion. On the other hand, even in the absence of proof that the Defendants acted knowingly, the use of Plaintiff's trademark to identify similar services may indicate a likelihood of confusion." [1-ER-41-42.]

Defendants used a confusingly similar mark to identify similar services. (*See* Sections B.2 and 3 above.) Defendants have also been aware of the SmartBiz Marks because they had been sending BillFloat marketing emails for years, and because they received cease and desist letters from BillFloat. [5-ER-869-876, 926-931; 7-ER-1356-1372; 8-ER-1631-1634.] Despite receiving three cease and desist letters, Defendants continued to use the confusingly similar Smart Business Funding trademark and filed a trademark application for the same. [8-ER-1635-1643.] This strongly shows an intent by Defendants to derive benefit from

the reputation of the SmartBiz Mark.

### f. Marketing channels used

"If the Plaintiff's and Defendants' services are likely to be sold in the same or similar stores or outlets, or advertised in similar media, this may increase the likelihood of confusion." [1-ER-41-42.]

Here, the parties market to the same customers and partners through identical channels. Both parties advertise through their websites, AdWords, social media, and email marketing, among others. [5-ER-889-897; 5-ER-933-936; 5-ER-939-945; 5-ER-949-950; 5-ER-1014-1015; 6-ER-1141-1142; 6-ER-1146-1158; 6-ER-1160; 6-ER-1169-1170; 6-ER-1277-1348; 7-ER-1373-1374; 7-ER-1378-1628; 8-ER-1760; 8-ER-1803-1877; 8-ER-1886-1889.] For example, Cohen testified that just like SmartBiz, Smart Business Funding advertises to both customers and partners on Facebook. [5-ER-942.] Cohen also admitted that he could not identify any industries that SmartBiz does business with that Smart Business Funding does not also do business with. [5-ER-953.] And, he agreed that Smart Business Funding provides the same type of services to small businesses as SmartBiz does. [5-ER950, 953; 8-ER-1644-1650.]

### g. Consumer's degree of care

"The more sophisticated the potential consumers of the services or

the more costly the services, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may be. They may be less likely to be confused by similarities in the Plaintiff's and Defendants' trademarks."

Here, the degree of sophistication among consumers varies. [5-ER-907, 991-992.] However, many consumers are not sophisticated. [5-ER-907.] And, both parties serviced numerous small loans (under $5,000) which involve little consumer forethought. [5-ER-989, 991.]

> h.   *Service expansion*

The evidence showed that the parties' services already overlap so extensively, that this factor is not very relevant to the overall analysis, such that this factor is neutral. (*See* Section B.2.) Adding to the likelihood of confusion, Collins Cash started as a small business but has grown significantly over the past years, currently earning millions of dollars annually. [5-ER-957-960 (revenues of $285,313 in 2015; $439,831 in 2016; $751,746 in 2017; 1,634,697 in 2018; $2,049,281 in 2019; $1.3 million in 2020; and $1,719,997 in 2021).]

In sum, because the evidence showed that the *Sleekcraft* factors weigh in favor of BillFloat, it is reasonably probable that the jury would have concluded that the Defendants infringed the SmartBiz Marks but

for the district court's errors. It follows that the district court's errors inflicted substantial prejudice on BillFloat, and thus, constitute reversible error.

## Conclusion

For the foregoing reasons, the district court's judgment should be reversed and remanded.

Dated: July 24, 2023

> SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
> Martin R. Bader
> Todd E. Lundell
> Jesse A. Salen
>
> By: */s/ Martin R. Bader*
>      Martin R. Bader
>  Attorneys for BillFloat Inc.

## Certificate of Compliance

The undersigned certifies that pursuant to Federal Rule of Appellate Procedure, Rules 32(a)(5) and (6), and Circuit Rule 28.1-1(b), this brief uses a 14-point proportionally-spaced font and contains 12,261 words according to the word count feature of the word processor used to prepare this brief, exclusive of the matters that may be omitted under Rule 32(f).

Dated: July 24, 2023

*/s/ Martin R. Bader*

## Statement of Related Cases

Pursuant to Circuit Rule 28-2.6, BillFloat Inc. states that there are no known related cases pending before this Court.

Dated:  July 24, 2023

/s/ Martin R. Bader

## Certificate of Service

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 24, 2023.

I certify that all participants in the case are registered CM/ECF Users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 24, 2023

*/s/ Martin R. Bader*